UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY ALLEN RENDER,

|  | Plaintiff, | Case No. 12-10537 |
|---|---|---|
|  |  | Honorable Gerald E. Rosen |
|  |  | Magistrate Judge David R. Grand |

v.

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 15]

Plaintiff Jeffrey Allen Render ("Render") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 15], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.     RECOMMENDATION

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Render is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [15] be GRANTED, Render's Motion for Summary Judgment [11] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

II.    **REPORT**

    A.    **Procedural History**

On July 15, 2009, Render filed applications for DIB and SSI, alleging a disability onset date of January 2, 2007. (Tr. 118-27). These applications were denied initially on December 4, 2009. (Tr. 77-84). Render filed a timely request for an administrative hearing, which was held on January 27, 2011, before ALJ Mary Ann Poulose. (Tr. 46-74). Render, who was represented by attorney Steven Harthorn, testified at the hearing, as did vocational expert ("VE") Glee Ann Kehr. (*Id.*). On May 16, 2011, the ALJ found that Render was not disabled. (Tr. 19-28). On December 14, 2011, the Appeals Council denied review. (Tr. 1-5). Render filed for judicial review of the final decision on February 8, 2012 [1].

    B.    **Background**

        *1.    Disability Reports*

In a July 17, 2009 disability field office report, Render reported that his alleged onset date was January 2, 2007. (Tr. 161). The claims examiner noted that, during a face-to-face interview, Render did not have any difficulty understanding, concentrating, talking, answering questions, sitting, standing, or walking. (Tr. 163-64). The claims examiner also noted that Render had sores covering his face, arms, and legs. (Tr. 164).

In an undated disability report, Render indicated that his ability to work is limited by skin cancer (basal cell melanoma), a lower back injury, and fibromyalgia. (Tr. 167). When describing how these conditions limit his ability to work, Render stated, "I have open sores that will not heal. I cannot turn my hands. I get tired going to a grocery store. I cannot lift or twist. I have trouble reaching." (*Id.*). Render reported that these conditions first interfered with his ability to work in 1993, and that he became unable to work on January 2, 2007. (*Id.*). Since that time, he worked briefly, but he has not worked since December 15, 2008 because of his

2

condition.  (*Id.*).

Render completed high school but had no further education.  (Tr. 172).  Prior to stopping work, Render worked as a kitchen manager/sous chef, earning $11.50 per hour.  (Tr. 168).  In that job, he cooked, ordered supplies, scheduled employees, put away stock, and performed the accounts payable function.  (*Id.*).  He was required to sit one hour per day; walk three hours per day; stand four hours per day; stoop, kneel, and crouch six hours per day; handle, grab, or grasp big objects five hours per day; and reach eight hours per day.  (*Id.*).  He was frequently required to lift fifty pounds, and supervised between two and thirty people.  (*Id.*).

Render indicated that he had treated with several medical providers regarding his lower back pain and skin cancer.  (Tr. 169-71).  At the time of the report, he was taking several medications, including Naproxen, Ranitidine, Vicodin (for pain), and Tramadol (for stomach upset caused by the pain medication).  (Tr. 172).  He claimed that both Naproxen and Ranitidine made him drowsy.  (*Id.*).  He further reported that he had a blood test and an MRI/CT scan of his lower back, both in 2007.  (*Id.*).

In an undated disability appeals report, Render reported that his condition had worsened since his last report.  (Tr. 178).  Specifically, he had an additional cancerous growth on his face, problems with his legs (which he described as "possible cancer"), increased back pain, and arthritic problems in his wrist and legs (which were getting worse over time).  (*Id.*).  Since the time of his last report, the only new medical provider he reported having seen was Dr. Samer Bau at Michigan Ear Nose & Throat, but when asked to state the reason for this visit, Render said "unknown."  (Tr. 179).  He was taking Lisinopril (for high blood pressure), Vicodin (for pain), and Tramadol (for stomach upset caused by the pain medication).  (Tr. 180).  He did not report any side effects from these medications.  (*Id.*).  Since his last report, he claimed to have

3

undergone a biopsy (in February of 2010), though the transcript contains no record of that procedure. (*Id.*).

       2.    *Plaintiff's Testimony*

At the January 27, 2011 hearing before the ALJ, Render testified that, since falling 20 feet and suffering a closed head injury in 2007, he has lived in a house with his parents. (Tr. 52, 55). He has a driver's license but tries not to drive because of vision problems in his left eye. (Tr. 54). He does not cook meals for himself, wash dishes, or do laundry (his mother performs these chores for him). (Tr. 55). He does not take out the trash or go grocery shopping. (*Id.*). He is able to attend to his personal care, although he usually wears "pull-on clothes" and sometimes has trouble with his socks. (Tr. 55-56). He can lift a gallon of milk, but would not try to lift a case of soda because he fears it would hurt his back. (Tr. 57). He can walk for five or ten minutes before needing to take a break because of low back pain. (Tr. 56). If he moves incorrectly, he loses control of his bladder. (Tr. 56, 64-65). He has no feeling in his left ear. (Tr. 66). His doctor prescribed a cane for him approximately one year earlier, but he does not yet have it. (Tr. 58). He has difficulty reaching to shoulder height and overhead. (Tr. 59). Render testified that he takes Vicodin five times a day, Naproxen twice a day, two blood pressure medications, and a medication for the pressure in his left eye. (Tr. 60).

On a typical day, Render gets up between 5:00 a.m. and 6:00 a.m., lies on the couch, and watches the news. (Tr. 63). His mother makes him breakfast, then he takes his medication and lies down again. (*Id.*). If he has a doctor's appointment, his mother drives him there; afterwards, he lies down and watches more television. (Tr. 64). He says that, on a good day, his pain is an eight out of ten; on a bad day, it is a nine or ten out of ten. (Tr. 69).

3.      *Medical Evidence*

(a)      *Treating Physician Records*

The record contains medical evidence regarding Render's basal cell carcinoma, low back/neck pain, and neurogenic bladder.[1]  For ease of reference, the court will discuss each set of records in turn.

(1)      *Basal Cell Carcinoma*

In 2005, Render was diagnosed with nodular basal cell carcinoma on the tip of his nose and underwent a biopsy.  (Tr. 204).  In August of 2009, Render was referred to Dr. Darius Karimipour because he had a one centimeter lesion on his nose.  (Tr. 229).  On September 10, 2009, he had Mohs basal cell skin cancer nose surgery, and at his follow-up visit one week later, he was "healing well with a normal post operative appearance."  (Tr. 267).

At a post-operative visit in November of 2009, Render's right nostril looked like it was going to split and was worrisome, and his nerve was twitching above his eye.  (Tr. 271).  By December 2, 2009, however, Render was no longer experiencing visible twitching.  (Tr. 273).  In May of 2010, Render complained of swelling in his forehead flap, and he underwent excision of a neuroma on June 22, 2010.[2]  (Tr. 256).  Although Render reported pressure in his forehead and nose at a July 12, 2010 follow-up visit, treatment notes reflect that he was "healing well." (Tr. 280).  At his next post-operative visit, on August 9, 2010, Render again complained of facial pressure behind his left eye – as well as numbness and twitching in his left ear – but his entire

---

[1] There are also some medical records pertaining to Render's vision impairment.  (Tr. 316). Because the ALJ found that this impairment is not "severe" under the Act, and because Render has not challenged that conclusion, the court will not discuss the medical records pertaining to that condition.

[2] The ALJ notes in her decision that Render underwent "an open reduction internal fixation on June 23, 2010."  (Tr. 24, citing Tr. 258).  It appears, however, that the medical record referenced by the ALJ does not pertain to Render and that he did not actually undergo such a procedure.

exam was normal.  (Tr. 281-82).

In February of 2009, Render reported a rash on his legs that was spreading to his arms. (Tr. 210).  Treatment notes from August of 2009 indicate that these lesions on Render's lower legs were "consistent with folliculitis."  (Tr. 229).

*(2)      Lower Back and Neck Pain*

In January of 2007, Render fell approximately twenty feet while intoxicated and suffered a closed head injury.  (Tr. 198).  In July of 2009, Render began reporting lower back pain.  (Tr. 243).  A series of spinal x-rays and MRIs in November of 2009 showed mild osteoporosis in the lumbar spine, mild narrowing of the disc spaces at L4-5 and L5-S1, mild degenerative changes in Render's sacroiliac joints, mild to moderate degenerative facet arthrosis of the cervical spine, and mild spinal stenosis at C6-7 due to central disc protrusion.  (Tr. 230-33).  On November 30, 2009, Render had a normal bone density test.  (Tr. 238-39).

In October of 2010, Render had another MRI of his cervical spine, which showed cervical spondylosis with foraminal impingements, but no disc herniation, acquired canal stenosis, or pathologic spinal cord signal.  (Tr. 264).  A March 2011 lumbar spine MRI showed multi-level degenerative disc disease (most notably at L3-L4 and L4-L5), moderate bilateral foraminal narrowing, and moderate to severe central canal stenosis (at L4-L5).  (Tr. 328).

On February 28, 2011, Render saw Dr. Jayant Jagannathon at the Detroit Medical Center Orthopedic Clinic.  (Tr. 324-26).  During his neurosurgical evaluation, Render complained of neck and back pain; however, Dr. Jagannathon did not find Render's neck pain consistent with his physical examination.  (Tr. 325).  Specifically, Dr. Jagannathon noted that although Render was reporting symptoms on the left, the disc herniation appeared to be more significant on the right.  (*Id.*).  Moreover, during the examination, Render's strength was 5/5 in all muscle groups,

6

including both the upper and lower extremities.  (*Id.*).  At different times during the examination, Render's strength appeared to give way; upon repetitive questioning, however, he was able to provide good strength.  (*Id.*).  Dr. Jagannathon also noted that at numerous times during the examination, Render referred to paperwork from his attorney and the fact that he needed copies of the notes sent to his attorney.  (Tr. 325-26).  Dr. Jagannathon did not recommend surgery but, rather, recommended a trial of physical and occupational therapy along with pain management.  (Tr. 325, 329-30).

### (3)    Neurogenic Bladder

From a review of the records, it appears that Render did not complain of urinary issues until November of 2010, but at that time, he reported having had problems with his bladder for years.  (Tr. 318-19, 324).  He reported incontinence when he strains or has pressure on his bladder.  (Tr. 318).  He was diagnosed with a neurogenic bladder secondary to neurological trauma and was started on Toviaz.  (Tr. 319).

### (b)    Consultative and Non-Examining Sources

On December 23, 2010, Dr. Raafia Mir completed a State of Michigan Medical Examination Report.  (Tr. 305-06).  In this report, Dr. Mir indicated that he had first examined Render on November 4, 2010.  (Tr. 305).  Dr. Mir further indicated that Render was able to lift less than 10 pounds occasionally and never more, and that he could stand and/or walk less than 2 hours in an 8-hour work day.  (Tr. 306).  Dr. Mir also indicated that Render could not use either upper extremity for repetitive grasping or reaching, but could use both upper extremities for repetitive pushing/pulling and fine manipulating.  (*Id.*).  Lastly, he indicated that Render was limited in comprehension, memory, sustained concentration, and social interaction.  (*Id.*).

### 4.    Vocational Expert's Testimony

Glee Ann Kehr testified as an independent vocational expert ("VE").  (Tr. 70-73).  The

VE characterized Render's past relevant work as a kitchen manager/sous chef as skilled in nature, and medium exertion (although Render performed it at the heavy exertional level). (Tr. 70). The ALJ asked the VE to imagine a claimant of Render's age, education, and work experience, who was able to perform light work, with only occasional climbing, crouching, crawling, kneeling, and stooping, and with no concentrated exposure to extreme temperatures or environmental irritants (such as dust, humidity, and chemicals). (Tr. 70-71). The VE testified that the hypothetical individual would not be capable of performing Render's past relevant work. (Tr. 71). However, the VE testified that the hypothetical individual would be capable of working in the positions of counter clerk (9,900 jobs in Michigan), office helper (3,700 jobs in Michigan), and information clerk (18,500 jobs in Michigan). (Tr. 71-72). Upon further questioning by the ALJ, the VE testified that if the hypothetical individual needed the option to sit or stand at will, all of these positions would be allowable, with a reduction of approximately 50% to allow for that limitation. (Tr. 72).

### C. Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of

impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Render is not disabled under the Act.  At Step One, the ALJ found that Render has not engaged in substantial gainful activity since January 2, 2007, his alleged onset date.  (Tr. 21).  At Step Two, the ALJ found that Render has the severe impairments of nodular basal cell carcinoma on the nose, folliculitis, lumbar degenerative disc disease, cervical spine spondylosis, and neurogenic bladder.[3]  (*Id.*).  At Step Three, the ALJ found that Render's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 22-23).

---

[3] The ALJ found that neither Render's hypertension nor his "vision impairment" constituted severe impairments.  (Tr. 22).

The ALJ then assessed Render's residual functional capacity ("RFC"), concluding that he is capable of performing light work, with only occasional climbing, crouching, crawling, kneeling, and stooping.  (Tr. 23-26).  The ALJ further found that Render requires work that avoids concentrated exposure to extreme temperatures and environmental irritants (such as dust, humidity, and chemicals), and that provides an option to sit or stand at will.  (*Id.*).

At Step Four, the ALJ determined that Render is unable to perform his past relevant work as a kitchen manager and/or sous chef, both of which were skilled in nature and performed at the heavy exertional level.  (Tr. 26).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Render is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 27).  As a result, the ALJ concluded that Render is not disabled under the Act.  (Tr. 27-28).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Render argues that the ALJ erred in: (1) failing to "give deference" to Dr. Mir's medical source statement; (2) failing to properly evaluate Render's credibility; and (3) failing to reasonably accommodate his need to alternate at will between sitting and standing.  Each of these arguments will be addressed in turn.

1. *The ALJ's Evaluation of Dr. Mir's Medical*
*Opinion is Supported by Substantial Evidence*

On December 23, 2010, Dr. Raafia Mir completed a State of Michigan Medical Examination Report. (Tr. 305-06). In this report, Dr. Mir simply checked boxes indicating that Render is able to lift less than 10 pounds occasionally and never more, and that he can stand and/or walk less than 2 hours in an 8-hour work day. (Tr. 306). Dr. Mir also indicated that Render cannot use either upper extremity for repetitive grasping or reaching, but can use both upper extremities for repetitive pushing/pulling and fine manipulating. (*Id.*). In addition, Dr. Mir indicated that Render is limited in comprehension, memory, sustained concentration, and social interaction. (*Id.*). The ALJ assigned "very little weight" to Dr. Mir's opinion. (Tr. 25-26). Render argues that the ALJ erred in failing to "provide specific reasons" for declining to give controlling weight to Dr. Mir's opinion, as required by the treating physician rule (20 CFR §416.927).

As an initial matter, Render's argument assumes – without citation to the record – that Dr. Mir was one of Render's treating physicians. (Doc. #11 at 13-14). As the ALJ reasonably found, the record lacks evidence that a treating relationship existed between Render and Dr. Mir prior to the completion of the medical examination report. (Tr. 25). At the hearing, Render testified that he sees various physicians, but he did not mention Dr. Mir. (Tr. 57-70). Moreover, on a questionnaire completed on October 4, 2010, Render identified his treating doctors, but he did not list Dr. Mir. (Tr. 186). Dr. Mir's report indicates that he first saw Render on November 4, 2010 (just over one month before the report was completed), suggesting that, even if a treatment relationship existed, it had just been established. (Tr. 305). The regulations explicitly provide that, "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical

12

opinion." 20 CFR §416.927(c)(2)(i). Here, then, where Render had treated with Dr. Mir for – at most – a matter of weeks, the reasoning for affording greater weight to the opinion of a treating physician simply does not apply. Thus, the ALJ's determination that Dr. Mir's opinion need not be viewed as that of a treating physician is supported by substantial evidence.

Moreover, even if Dr. Mir was properly considered a treating physician, the ALJ gave good reasons for giving his opinion little weight. The applicable regulations provide that a treating physician's opinion receives controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with the other substantial evidence in the record. 20 CFR §416.927(c)(2). If a treating source opinion is not accorded controlling weight, the ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion.[4] *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

In this case, the ALJ gave several reasons for giving Dr. Mir's opinion little weight, all of which are supported by substantial evidence. First, as discussed above, the ALJ noted the lack of an established treatment relationship between Render and Dr. Mir. (Tr. 25). Second, the ALJ found Dr. Mir's "check-box" opinion to be unsupported, noting an absence of a narrative "explanation" of the basis for his opinion, and the fact that the opinion was not consistent with other objective medical evidence in the record. (Tr. 25-26). The fact that Dr. Mir provided his

---

[4] The ALJ is not required to discuss in detail each one of these factors. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis.").

opinion in conclusory form is a valid consideration when determining how much weight it should be given.  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.'") (internal citations omitted).  In addition, the ALJ noted internal inconsistencies with Dr. Mir's opinion,[5] which, again, gave his opinion less credence. (Tr. 26).  In sum, the ALJ provided a well-supported and sufficiently specific explanation as to her consideration of Dr. Mir's opinion.  This satisfied the ALJ's obligation to make clear to any subsequent reviewer *why* she gave Dr. Mir's opinion limited weight.  *See* SSR 96-2p, 1996 WL 374188, at *5.

Render also suggests that the ALJ should have ordered a physical or psychiatric examination in this case.  (Doc. #11 at 14).  The ALJ has the discretion to determine whether such an evaluation is necessary based on the sufficiency of the record before her.  *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").  *See also* 20 C.F.R. §404.1517.  In this case, as detailed above, there was sufficient medical evidence in the record to permit the ALJ to make an informed decision, and she did not abuse her discretion in declining to order an additional physical or psychological evaluation.

2.    *The ALJ's Credibility Determination is Supported by Substantial Evidence*

Render next argues that the ALJ erred in failing to adequately assess the credibility of his subjective complaints.  As the Sixth Circuit has held, determinations of credibility related to

---

[5] Specifically, the ALJ noted that Dr. Mir's opinion that Render could use his arms for repetitive grasping and reaching was inconsistent with his opinion that Render could not use his arms for repetitive pushing, pulling, or fine manipulation.  (Tr. 26, citing Tr. 306).

14

subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Secretary of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981)*, quoting Beavers v. Secretary of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978).   Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).   The ALJ is not required to accept a claimant's testimony if it conflicts with medical reports and other evidence in the record.   *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).   Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible.   *Soc. Sec. Rul.* 96-7p, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

In this case, in concluding that Render has the residual functional capacity to perform light work, with certain additional limitations, the ALJ considered both Render's subjective complaints and the objective medical evidence.   (Tr. 23-26).   This is not a case where, as Render alleges, the ALJ simply made a "single, conclusory statement" as to his credibility or merely recited the factors to be considered without actually evaluating the evidence.   (Doc. #11 at 11). Rather, the ALJ provided several detailed reasons for concluding that Render's allegations regarding his abilities to sit, stand, walk, and lift were only partially credible, and these reasons are supported by substantial evidence.

For example, the ALJ referenced a neurosurgical clinical evaluation in February of 2011,

15

where the examining physician, Dr. Jagannathon, found Render's neck pain inconsistent with his physical examination.  (Tr. 25, citing Tr. 325).  Specifically, Dr. Jagannathon said:  "I do not find Mr. Render's neck pain consistent with his physical examination as it appears that the disk herniations appear to be more significant towards the right-hand side.  All of his symptoms appear to be towards the left."  (Tr. 325).  This discrepancy, along with the fact that Render's strength was 5/5 in all groups on examination and that he repeatedly referred to "paperwork from his attorney," reasonably caused the ALJ to conclude that Render "may be exaggerating his symptoms in an attempt to obtain disability benefits."[6]  (Tr. 25).

Render argues that the ALJ's conclusion in this respect was not "factually accurate" because portions of the October 28, 2010 MRI tended to suggest that his symptoms should be bilateral or slightly worse on the left side.  (Doc. #11 at 16).  However, a portion of the October 28, 2010 MRI referenced by Dr. Jagannathon specifically notes that, "At C4-C5, there is severe bilateral spondylitic exit foraminal impingement, **slightly greater on the right**."  (Tr. 264) (emphasis added).  Thus, Dr. Jagannathon's impression was not factually inaccurate, as Render alleges, and the ALJ's reliance on the discrepancy between Render's symptoms and the objective medical records is supported by substantial evidence.  (Tr. 25).

It was entirely appropriate for the ALJ to consider Dr. Jagannathon's statements in evaluating Render's credibility.  The ALJ recognized the duty imposed upon her by the regulations and, in addition to Render's own subjective complaints, she considered the objective

---

[6] Render suggests that there was an explanation for his repeated references to this paperwork, saying that it is "merely representative of the level of how desperate he is . . . to obtain sufficient medical treatment . . . ."  (Doc. #11 at 16).  Even if there was such a benign explanation for this evidence, the ALJ's reading of the evidence was also reasonable and is supported by substantial evidence.  The substantial evidence standard presumes that there is a "zone of choice" within which an ALJ can make decisions without interference from the courts.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281-82 (6th Cir. 2009).

medical evidence, as well as Render's daily activities during the relevant time period. (Tr. 23-24). Thus, the ALJ's credibility determination is supported by substantial evidence in the record.

### 3. The ALJ Reasonably Accommodated Render's Need To Alternate at Will Between Sitting and Standing

In her decision, the ALJ found that Render requires a sit/stand option that would allow him to alternate at will between sitting and standing. (Tr. 23). Social Security Ruling ("SSR") 83-12 explicitly addresses "special situations" in which an individual needs to alternate sitting and standing, saying:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for a while before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)
>
> There are some jobs in the national economy – typically professional and managerial ones – in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the occupational base.

SSR 83-12, 1983 WL 31253, at *4.

In accordance with this Ruling, the ALJ sought testimony from a vocational expert to determine whether jobs exist in the national economy that could be performed by an individual with Render's limitations. (Tr. 70-73). In response to hypothetical questions posed by the ALJ,

17

the VE testified that an individual with the same vocational profile and limitations as Render could perform the jobs of counter clerk, office helper, and information clerk. (Tr. 71-72). The VE further testified that if the hypothetical individual needed the option to sit or stand at will, all of the identified positions would be allowable, with a reduction of approximately 50% to allow for that limitation.[7] (Tr. 72).

Render first argues that the ALJ erred in concluding that there are unskilled jobs that would allow for a sit/stand option.[8] (Doc. #11 at 11-13). Citing to SSR 83-12, Render argues that unskilled jobs are "particularly structured so that a person cannot ordinarily sit or stand at will." (*Id.*). Render's argument, however, simply ignores the sentence immediately following the one he quoted, which provides: "In cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the occupational base." 1983 WL 31253, at *4. Here, that is precisely what the ALJ did; she sought and received testimony from the VE regarding how a sit/stand option would affect the occupational base of the identified jobs. (Tr. 71-72).

In *Sharp v. Barnhart*, 152 F. App'x 503, 506-07 (6th Cir. 2005), a case relied on by the Commissioner, the Sixth Circuit found, under similar circumstances, that a hypothetical question posed to a VE limiting a claimant to unskilled work that allowed for a sit/stand option did not

---

[7] The VE testified as to the number of jobs available in Michigan – counter clerk (9,900), office helper (3,700), and information clerk (18,500). (Tr. 71-72). The identified number of jobs are prior to the 50% erosion of the occupational base. (*Id.*). In her decision, the ALJ found that these jobs exist in significant numbers in Michigan after accounting for erosion – counter clerk (4,950), office helper (1,850), **and** information clerk (9,250). (Tr. 27). Render has not challenged this finding.

[8] Render also argues that the ALJ erred in failing to "make a finding as to the number of hours that [he] could stand or walk in an 8 hour day." (Doc. #11 at 12). This argument is without merit, however, as the ALJ explicitly found that Render required the ability to decide for himself how long he needed to sit or stand before alternating position. (Tr. 25). SSR 83-12 specifically envisions situations such as these, where an individual may require the option to sit or stand at will.

contravene SSR 83-12. In that case, the court held that, rather than contradicting SSR 83-12, the hypothetical question posed to the VE – which included the option to sit/stand at will – sought to identify only those jobs that the claimant's impairments would allow him to perform. *Id.* at 507. According to the court, "This accords with the ruling's directive that '[i]n cases of unusual limitation of ability to sit or stand, [an expert] should be consulted to clarify the implications for the occupational base.'" *Id.* (quoting SSR 83-12). Therefore, as in *Sharp*, the ALJ complied with SSR 83-12 when he sought testimony from the VE regarding the effect of a sit/stand option on the occupational base.[9]

Render also takes issue with the ALJ's conclusion that there are jobs performed at the light exertional level that would allow for a sit/stand option. (Doc. #11 at 11-13). In support of this argument, Render relies on 20 CFR §404.1567(b), which defines "light work," in relevant part, as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

*Id.* The Commissioner does not disagree with the proposition that, as a general rule, jobs

---

[9] Render's reliance on *Martinez v. Comm'r of Soc. Sec.*, 692 F.Supp.2d 822, 825 (N.D. Ohio 2010), is without merit. In *Martinez*, the ALJ had included in his RFC that Martinez's "impairments would prevent standing and walking more than 50% of the 8 hour workday." *Id.* at 824. However, the ALJ failed to include such a limitation in his hypothetical question to the VE. *Id.* Here, in contrast, the ALJ reasonably did not impose such a limitation in Render's RFC, and included in her hypothetical question to the VE all of the limitations she did find to exist, including Render's need for a sit/stand option *at will*. (Tr. 70-72). SSR 96-9p states that the "RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." However, this court has previously held that this requirement "does not mean that the RFC must contain increments of time to be spent in each position where, as here, the RFC states unambiguously that Plaintiff needs to be able to sit or stand 'at will.'" *Williams v. Astrue*, 2009 WL 2840497, at *10 (E.D. Mich. July 28, 2009)(internal citations omitted).

performed at the light level of exertion typically require "a good deal of walking or standing."

(Doc. #15 at 10).  However, as the Commissioner points out, SSR 83-12 explicitly recognizes

that there are some "light" jobs that can accommodate a sit/stand option:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing.
>
> \*       \*       \*
>
> In cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the occupational base.

1983 WL 31253, at \*4.  In this case, the ALJ sought testimony from the VE as to what light jobs

(if any) an individual with Render's limitations – including the need to sit/stand at will – could

perform.  (Tr. 71-72).  In light of the VE's testimony about the availability of such jobs,

substantial evidence supports the ALJ's finding that Render can perform jobs existing in

significant numbers in the national economy.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion

for Summary Judgment [15] be GRANTED, Render's Motion for Summary Judgment [11] be

DENIED, and the ALJ's decision be AFFIRMED.


Dated: November 27, 2012                    s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 27, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager